# EXHIBIT A



**ASSET SALE AGREEMENT**

THIS ASSET SALE AGREEMENT ("Agreement"), entered into this 2nd day of November, 2018, by and between the undersigned Seller and Buyer sets forth the terms and conditions whereby the Seller agrees to sell and the Buyer agrees to purchase the Loan(s) identified herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Seller and the Buyer hereby agree as follows:

1.      **Definitions**.  Capitalized terms shall be defined as set forth in this Agreement, including in Appendix A to this Agreement.

2.      **Agreement to Purchase and Sell**.  Subject to and in accordance with the terms and conditions of this Agreement, the Seller hereby agrees to sell, assign, transfer and convey to the Buyer on the Closing Date, and the Buyer hereby agrees to purchase and accept on the Closing Date, all rights, title, and interests of the Seller, together with all payment and performance obligations of the Seller, as of the Closing Date, in, to and under the Loan(s) set forth on Schedule A attached hereto.

3.      **Payment of Purchase Price; Closing**.  The closing shall occur on the Closing Date, by delivery of Closing Documents.

      3.1.    **Earnest Money**.  On the first Business Day following the Bid Award Date, the Buyer shall pay the Earnest Money, by wire transfer in immediately available funds, to the Seller pursuant to the wire transfer instructions set forth in the Bid Award Letter.

      3.2.    **Payment of Adjusted Purchase Price**.  On the Closing Date, the Buyer shall pay to the Seller by wire transfer in immediately available funds, the amount of the Purchase Price as of the Cut-off Date, adjusted as follows:  (a) less the Earnest Money previously received by the Seller, (b) less all past-due taxes, assessments, homeowners' association payments, and other amounts that would constitute a lien with priority over the Mortgage on a mortgaged property, (c) plus, for Loan(s) that are less than sixty (60) days past due as of the Closing Date, the accrued and unpaid interest owing on such Loan(s) through the day before the Closing Date.  The adjusted Purchase Price shall be calculated on the Funding Schedule on a loan level basis.  On the Closing Date, the Buyer shall pay to the Seller, in addition to the adjusted Purchase Price, by separate wire transfer in immediately available funds, the sum of the corporate advances and escrow advances for each Loan, both with balances as of the Cut-off Date (the "Advance Reimbursement").  The Advance Reimbursement will also be set forth on the Funding

Schedule.  The funds must be wired to Seller at: U.S. Bank, Bloomington, MN for credit to a/c #112588726, ABA 091000022, Attn: Deb Wiese-Truman settlement.

3.3.    **Conveyance**.  Upon receipt of the Purchase Price, the Seller shall sell, assign, transfer and convey the Loan(s) to the Buyer subject to and in accordance with the provisions of this Agreement.

3.4.    **Taxes, Fees, Etc**.  The Buyer shall pay all transfer, filing and recording fees, transfer taxes, costs and expenses related to the transfer, and any applicable documentary taxes, required to be paid by either the Seller or the Buyer in connection with the transactions contemplated hereby, and hereby agrees to indemnify and hold the Seller harmless from and against any and all claims, liability, costs and expenses arising out of or in connection with the failure of the Buyer to pay any such amount on a timely basis.  The Buyer shall pay any such fees outlined in this Section 3.4 within ten (10) Business Days after the date of the Seller's invoice therefor.  This Section shall not require the Buyer to pay any transfer taxes, costs or expenses related to the Seller's sales or income tax obligations occasioned by the sale of the Loan(s).

3.5.    **Payments Subsequent to the Closing Date**.  After the Closing Date the Seller shall continue to service the Loans for the Buyer pursuant to the terms of an Interim Servicing Agreement in the form attached hereto as Attachment 5 (the "Interim Servicing Agreement").  For the avoidance of doubt, any Collections received from incentives on the HAMP Loans shall be prorated as of the Cut-off Date so that any percentage associated with the period commencing prior to the Cut-off Date belong to the Seller.  On the Servicing Transfer Date, Buyer shall reimburse Seller for all servicing advances as set forth in the Interim Servicing Agreement made from and after the Cut-off Date.  Further, any advances made on behalf of Seller as specified on Section 3.2 (b) shall not be considered an advance and will not be reimbursed by the Buyer.

4.    **Transfer of Loan(s).**

4.1.    **Closing Documents**.  On or before October 24, 2018, the Seller shall deliver to the Custodian, pursuant to the terms of a Bailee Letter, (a) the original Note(s), or affidavits of lost Note(s), with all intervening endorsements to reflect a complete chain of title from the originator to the Seller, endorsed in blank by allonge in the form attached hereto as Attachment 2, an original or a copy of the mortgage with proof of recording, (b) originals or copies with proof of recording of all intervening assignments, (c) an original or a copy of the final title policy, (d) the original or copies of all modification, assumption, consolidation or extension agreements, with proof of recording, if applicable, and (e) electronic data with assignment(s) of the Mortgages in the form attached hereto as Attachment 3.  If such form in Attachment 3 is not acceptable in the jurisdiction in which the Loan is located, the Seller may provide another form acceptable under state law where the property is located.  The Seller and Buyer shall mutually agree to the lost note affidavit form which, at a minimum, shall include indemnification of the Buyer and shall be assignable to the Buyer, its successors and assigns. The lost note affidavits shall be executed by the Seller.  Not later than the Business Day prior to the Closing Date, the Seller shall deliver to the Escrow Agent (i) a Bill of Sale in the form attached hereto as

2

Attachment 1, selling, assigning, transferring and conveying to the Buyer all rights, title and interests of the Seller in, to and under the Loan(s), all on the terms and conditions set forth in this Agreement; (ii) an Assignment and Assumption Agreement required for the transfer of the HAMP Loan(s) in the form attached hereto as Attachment 4; and (iii) the Interim Servicing Agreement (collectively, to the extent delivered to the Escrow Agent or the Custodian, the "Closing Documents").

**4.2.    Escrow Agent's Delivery of Closing Documents**.  The Escrow Agent shall have no obligation to review the Closing Documents for completeness, authenticity, sufficiency, or otherwise.  The Escrow Agent shall make the Closing Documents available for review by the Buyer prior to the closing.  The Escrow Agent shall have the Closing Documents delivered to the Buyer by hand or overnight delivery upon the Escrow Agent's receipt of notification that the Seller has received the adjusted Purchase Price.

**4.3.    Delivery of Collateral Documents, Etc**.  Within ten (10) days after the Closing Date, the Seller shall deliver to the Custodian the entire Review File as outlined in Section 4.1.

**4.4.    HAMP Loans**.

(a)    If there are any HAMP Loans purchased by Buyer, in order to comply with the transfer requirements of participating servicers in the Home Affordable Modification Program ("HAMP"), the Seller and Buyer, or its Designated Servicer, shall execute an Assignment and Assumption Agreement as required by the terms and conditions of the Servicer Participation Agreement (the "SPA").  Prior to the Closing Date, Seller shall forward to Buyer the Assignment and Assumption Agreement, in the form as set forth in Attachment 4, which shall be executed before or on the Closing Date.

(b)    After the Closing Date, the Seller and Buyer, or its Designated Servicer, shall execute all other documents required and necessary to complete the transfer of the HAMP Loan(s) and shall send all notices and other related documents as applicable and required under HAMP.

(c)    In the event that Seller commences a HAMP application on a Loan listed in Schedule A prior to the Closing Date, and the HAMP application is subsequently approved thereby making the Loan a HAMP Loan after the Closing Date, the Buyer hereby acknowledges and agrees that it will fully accept the subsequent HAMP approval of such Loan and that it will service the Loan as a HAMP Loan.

**4.5.    Execution of Separate Loan Assignments**.  Within ten (10) days after the Servicing Transfer Date, the Seller shall prepare, execute, and deliver such other documents and instruments as the Buyer may reasonably request to transfer to such Buyer the rights, title and interests of the Seller in, to and under the Loans (collectively, "Separate Loan Assignments").  The Separate Loan Assignments shall be without

3

recourse, representation or warranty of any kind or nature.  Such qualifying language on the Separate Loan Assignments shall not affect, limit or enlarge the obligations of the Seller and the rights, remedies and recourse of the Buyer under this Agreement.

**4.6.    Hazard, Liability Insurance, Etc**.  At the request and sole cost and expense of the Buyer, the Seller shall cooperate with the Buyer in executing written requests to each hazard, casualty and liability insurer, and to the writing agent for each flood hazard insurer, issuing a policy of insurance obtained by an Obligor with respect to the Loan(s), requesting an endorsement of its policy of insurance effective on the Servicing Transfer Date adding the Buyer as the mortgagee, the loss payee and/or an insured named therein, as the case may be, together with instructions that such endorsement be forwarded directly to the Buyer, with a copy to the Seller at the address herein specified for notices.  Each such request shall be prepared by the Buyer at its sole cost and expense, and any additional premium or other charge in connection therewith shall be paid by the Buyer.  The Buyer shall not be entitled to be added to or acquire an interest in any policy of insurance obtained by the Seller.  Any loss on or after the Servicing Transfer Date either to an Obligor, the Buyer or to the value or collectability of the Loan(s) due to the Seller's cancellation of collateral or real property risk insurance or its failure to identify the Buyer as loss payee, mortgagee or other insured is the sole responsibility of the Buyer.

**4.7.    Compliance with RESPA, Servicing**.  Seller shall retain servicing rights to the Loans for a period of up to sixty (60) days after the Closing Date (the end of such period, the "Servicing Transfer Date"), in accordance with the Real Estate Settlement Procedures Act ("RESPA").  Buyer and Seller agree, both prior to and after the Closing Date, to execute any documents necessary to comply with RESPA or any other statute or regulation relating to the servicing or ownership of the Loans, including but not limited to a servicer transfer notice.  Seller agrees to service the Loans in accordance with the Interim Servicing Agreement.  On the Servicing Transfer Date, the collection and receipt of all proceeds, interest and principal due on the Loans and the actual performance of servicing shall pass to the Buyer, and Seller shall be discharged from all duties and obligations arising from such servicing.  If the Seller receives any proceeds or payments for the Loans after the Servicing Transfer Date, the Seller shall forward the same to the Designated Servicer within five (5) Business Days to Buyer.

**4.8.    U.S. Trustee Remediation Loans**.  Following the Closing Date, the U.S. Trustee Remediation Loans may be subject to monetary remediation (mailing a check to the borrower) and/or the possibility of additional review, validation and/or remediation as part of an independent review arising in connection with a potential settlement between the Seller and the United States Trustees (the "U.S. Trustee Settlement").  Seller will retain the data required to facilitate any subsequent review after the Closing Date, and will be responsible for all costs incurred as a result of such monetary remediation or additional review/validation.  Subject to any applicable privacy laws and regulations, the Buyer agrees to cooperate with the Seller to the extent that the Buyer's assistance is deemed reasonably necessary by the Seller to fulfill the Seller's obligations with respect to such United States Trustee Settlement, including, without limitation, by completing any required updates to U.S. Trustee Remediation Loan histories on the Buyer's system

4

of record, providing borrower information to the extent necessary to locate borrowers for the distribution of remediation checks, and allowing the Seller to file, or to direct the filing of, corrective court-filed documents relating to the prior servicing of such U.S. Trustee Remediation Loans.

**5.**     **Representations and Warranties of the Buyer**.  The Buyer hereby represents and warrants as follows:

**5.1.**     **Organization, Existence, Etc**.  The Buyer is duly formed or organized, validly existing and in good standing under the laws of the jurisdiction of its formation or organization, and is registered or qualified to conduct business in all other jurisdictions in which the failure to be so registered or qualified would materially and adversely affect the ability of the Buyer to perform its obligations hereunder.

**5.2.**     **Authority and Enforceability, Etc**.  The Buyer has the power and authority to execute, deliver and perform each of the Sale Documents to which it is a party and has taken all necessary action to authorize such execution, delivery and performance.  The Buyer's execution of this Agreement and its performance of its obligations hereunder are not subject to any further approval, vote or contingency from any person or committee.  Assuming due authorization, execution and delivery by the Seller, the Sale Documents and all obligations of the Buyer thereunder are the legal, valid and binding obligations of the Buyer, enforceable in accordance with the terms of the Sale Documents, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**5.3.**     **Conflict with Existing Laws or Contracts**.  The execution and delivery of the Sale Documents and the performance by the Buyer of its obligations thereunder will not conflict with or be a breach of any provision of any law, regulation, judgment, order, decree, writ, injunction, contract, agreement or instrument to which the Buyer is subject; and the Buyer has obtained any consent, approval, authorization or order of any court or governmental agency or body required for the execution, delivery and performance by the Buyer of the Sale Documents.

**5.4.**     **Financial Condition**.  Neither the Buyer nor any general partner, limited partner, shareholder or joint venturer in the Buyer is involved in any financial difficulties which would impair or prevent a closing pursuant to this Agreement on the Closing Date.  The Buyer has now and will have as of the Closing Date sufficient liquid assets, capital and net worth to meet its obligations under the Sale Documents and to pay the Purchase Price without any financing or other contingencies.

**5.5.**     **Decision to Purchase**.  The Buyer's bid and decision to purchase the Loan(s) is based upon its own comprehensive review and independent expert evaluation and analysis of the Review File and other materials deemed relevant by the Buyer and its agents.  The Buyer has read and agrees to all of the terms and conditions of the Terms of Sale Memorandum.  The Buyer has made such independent investigation as the Buyer

deems to be warranted into the nature, title, attachment, perfection, priority, validity, enforceability, collectability, and value of the Loan(s), the title, condition and value of any collateral securing the Loan(s), the market conditions and other characteristics of the places where any such collateral is located, and all other facts it deems material to the purchase of the Loan(s).

      **5.6.** **No Reliance**. In entering into this Agreement and the other Sale Documents, the Buyer has not relied upon any oral or written information from the Seller, DebtX, or any of their respective employees, agents, attorneys or representatives, other than the limited representations and warranties of the Seller contained herein. The Buyer acknowledges that no employee, agent, attorney or representative of the Seller or DebtX has been authorized to make, and that the Buyer has not relied upon, any statements, representations or warranties other than those specifically contained in this Agreement.

      **5.7.** **Buyer a Sophisticated Investor**. The Buyer is a sophisticated investor (as that term is used in regulations promulgated under the Securities Act of 1933) who could withstand the loss of the entire Purchase Price.

      **5.8.** **Information True and Correct, Full Disclosure**. The information provided by the Buyer in connection with its qualification as a bidder, was true and correct on the date provided and did not omit any information necessary to the accuracy and full disclosure of information provided and such information is accurate and complete on the date hereof.

      **5.9.** **Brokers**. No broker or other party entitled to a commission is involved in connection with this transaction other than DebtX.

      **5.10.** **Participating Servicer in HAMP**. If the Mortgage Loan Schedule contains any HAMP Loan(s), Buyer or its Designated Servicer (i) is a registered servicer under HAMP; (ii) is eligible, under its own SPA, and under any and all applicable Federal or state laws and regulations, to purchase and accept any such HAMP Loan(s); and (iii) is aware of and agrees to assume the additional responsibilities associated with the transfer, ownership and servicing of such HAMP Loan(s) as set forth in the SPA.

      **6.** **Seller's Representations, Warranties and Recourse**. This sale is made without recourse against the Seller, or representation or warranty by the Seller, whether expressed, implied or imposed by law, of any kind or nature except as provided in Sections 6 and 21 of this Agreement. The Seller has attempted to provide accurate information to all prospective Bidders. Without limiting the generality of the foregoing, the Seller does not represent, warrant or insure the accuracy or completeness of any information or its sources of information contained in the Bid Package or in the Review File, Collateral Documents, Note(s) or Loan(s) (whether contained in originals, duplicate originals, copies, or magnetic media, including computer tapes and disks), including without limitation any reports or other information prepared by accountants, engineers, appraisers, environmental consultants or other professionals. The Loans are sold as is and Seller has not, does not and will not make any representations or warranties with respect to the collectability of any Loan or the value or condition of the Mortgaged Property. To the extent the Loan(s) constitute personal or real property, such property is sold "as is, where is," and the Seller

6

expressly disclaims any representations or warranties with respect to such property.  The Seller expressly disclaims any liability relating to compliance, documentation or otherwise in connection with any modifications of HAMP Loan(s) made under the SPA.

**6.1.    Representations and Warranties by the Seller.**  The Seller hereby represents and warrants as follows:

**6.1.1.   Organization, Existence, Etc**.  The Seller is duly formed or organized, validly existing and in good standing under the laws of the jurisdiction of its formation or organization, and is registered or qualified to conduct business in all other jurisdictions in which the failure to be so registered or qualified would materially and adversely affect the ability of the Seller to perform its obligations hereunder.

**6.1.2.   Authority, Enforceability, Etc**.  The Seller has taken all necessary action to authorize execution, delivery and performance of each of the Sale Documents to which it is a party.  Assuming due authorization, execution and delivery by the Buyer, the Sale Documents and all the obligations of the Seller thereunder are the legal, valid and binding obligations of the Seller enforceable in accordance with the terms of the Sale Documents, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**6.1.3.   Conflict with Existing Laws or Contracts**.  The execution and delivery of the Sale Documents and the performance by the Seller of its obligations thereunder will not conflict with or be a breach of any material provision of any law, regulation, judgment, order, decree, writ, injunction, contract, agreement or instrument to which the Seller is subject; and the Seller has obtained any consent, approval, authorization or order of any court or governmental agency or body required for the execution, delivery and performance by the Seller of the Sale Documents.

**6.1.4.   Legal Action Against Seller**.  There is no action, suit or proceeding of which the Seller has received actual notice pending against the Seller in any court or by or before any other governmental agency or instrumentality which would materially affect the ability of the Seller to carry out the transactions contemplated by the Sale Documents.

**6.1.5.   Brokers**.  No broker or other party entitled to a commission is involved in connection with this transaction other than DebtX.

**6.2.    Representations and Warranties by Seller as to the Loan(s).**  Except as otherwise disclosed in the Review File or in publicly available records, the Seller hereby represents and warrants that, as to the Loan(s), the following representations and warranties are true and correct in all material respects as of the date hereof.

**6.2.1.   Title to Loan(s).**  As of the Closing Date, the Seller has title to and is the sole owner of the Loan(s).

**6.2.2.   Certain Schedule Information.**  All information set forth in Schedule A is true and correct as of the Cut-off Date.

**6.2.3.   Review File.**  With the exception of any Excluded Information and except as set forth on Appendix B, the Review File was delivered to the Custodian prior to the Closing Date.

**6.2.4.   Compliance with Law.**  Subject to Section 4.8, each Loan, at the time it was originated, complied in all material respects with applicable local, state and federal laws, rules and regulations, including usury, equal credit opportunity and disclosure laws and, since that time, has been serviced in compliance in all material respects with applicable local, state and federal laws, rules and regulations.

**6.2.5.   Collateral.**  Seller maintains a hard copy file with respect to each Loan that contains each of the documents of the Collateral Documents and Review File, unless the Seller has listed such documents as missing on Appendix B.

**6.2.6.   Priority of Lien.**  With respect to each Loan,

(a)   Seller has a first lien interest therein subject only to: (i) covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording acceptable to mortgage lending institutions generally and specifically referred to in the lender's title insurance policy delivered to the originator of the Loan and (1) referred to or to otherwise considered in the appraisal made for the originator of the Loan or (2) which do not adversely affect the appraised value of the mortgaged property set forth in such appraisal; and (ii) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property, and

(b)   there are no real property taxes or assessments or municipal liens that are currently past due.

**6.2.7.   Enforceability**.  The Note(s) and Mortgage(s) are the legal, valid and binding obligations of the Obligor thereof, enforceable against such Obligor in accordance with their terms (a) except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors rights generally and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law) and (b) except particular remedies, waivers and other provisions may not be enforceable, but such unenforceability does not affect the practical

8

realization of the intended benefits of the Mortgage(s), meaning the ability of the holder thereof to foreclose the Mortgage(s) for any payment default by the maker or obligor thereunder.

**6.2.8.   No Defense by Obligor**.  The Obligor has no valid defense that prevents enforcement by the holder thereof of the provisions of the Note(s) or Mortgage(s), or realization by the holder thereof or its assigns against the Mortgaged Property that arises from applicable local, state or federal laws, regulations or other requirements pertaining to usury and any or all other requirement of any federal, state or local law including, without limitation, truth-in-lending, real estate settlement procedures, consumer credit protection, and equal credit opportunity or disclosure laws applicable to such Loan(s).  The Loan(s) are not subject to any valid right of rescission, set-off, abatement, diminution, counterclaim or defense that prevents enforcement by the Seller thereof or its assigns of the provisions of the Note(s) or Mortgage(s), or realization by the Seller thereof or its assigns against the Mortgaged Property of the intended benefits of such Mortgage and no such claims have been asserted as of the date hereof with respect to such Loan.

**6.2.9.   No Modification**.  Except by written instrument or other written documentation contained in the Review File, neither the Seller nor any prior holder of the Loan(s) has modified the Note(s) or Mortgage(s) or satisfied, canceled or subordinated the Note(s) or Mortgage(s) in whole or in part or released all or any material portion of the Mortgaged Property from the lien of the Mortgage(s) or executed any instrument of release, cancellation or satisfaction. The Note(s) and Mortgage(s) and any documents modifying their terms included in the Review File are true and correct copies of the documents they purport to be and have not been superseded, amended, modified, canceled or otherwise changed except as disclosed in the Review File.

**6.2.10. Disbursement of Loan Proceeds**.  The Obligor does not have the right to disbursement of additional loan proceeds or future advances with respect to the Loan(s).

**6.2.11. Cross-Collateralization**.  The Loan(s) are not secured by the same property as any other loan held by the Seller or its affiliated entities, which is not the subject of this Agreement.

**6.2.12. Litigation**.  There is no litigation, proceeding or governmental investigation pending, or any order, injunction or decree outstanding, existing or relating to the Loan(s) or Mortgaged Property.

**6.2.13. Title Policy**.  Except as set forth on Appendix B, with respect to each Loan, a lender's title insurance policy, issued in standard American Land Title Association long or short form or, if the jurisdiction does not accept the standard American Land Title Association form, such other form as is generally acceptable to prudent lending institutions that originate or purchase Loans similar

9

to the Loan in that particular jurisdiction, by a title insurance company authorized to transact business in the jurisdiction in which the related Mortgaged Property is situated, in an amount at least equal to the original principal balance of such Loan, insuring Seller's interest under the related Loan as the holder of a valid first priority mortgage lien of record on the  real  property described in the Mortgage, subject only to exceptions for (i) liens for real property taxes and assessments not yet due and payable or liens for taxes and assessments which, as of the date hereof, have been paid, (ii) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording of the Mortgage which are acceptable to mortgage lending institutions generally and specifically reflected in the appraisal made in connection with the origination of the Loan, and (iii) other matters to which like properties are commonly subject which do not, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Mortgage, was effective on any date on or prior to the date hereof, and, as of the date hereof, such policy will be valid and thereafter shall continue in full force and effect. With respect to each Loan, the holder is the sole named insured of such mortgage title insurance policy, and such mortgage title insurance policy is in full force and effect and will be in full force and effect and inure to the benefit of Buyer (and any subsequent mortgagee) upon the consummation of  the  transactions contemplated by this Agreement.  No claims have been made under such mortgage title insurance policy and no prior holder of the related Mortgage, including Seller, has done, by act or omission, anything that would impair the coverage of such mortgage title insurance policy.

**6.2.14. Hazard Insurance**.  With respect to the Loans, either (i) the improvements upon a Mortgaged Property are covered by a valid and existing fire and hazard insurance policy with a generally acceptable carrier that provides for extended coverage customary in the area where the Mortgaged Property is located, and that is endorsed with a standard mortgagee clause with losses payable to Seller in an amount that is at least equal to the lesser of (A) the unpaid principal balance, (B) the full insurable value of the Mortgaged Property, or (C) the minimum amount required to compensate for damage or loss on a replacement cost basis; or (ii) the prior servicer maintains a blanket policy that insures against fire and hazards and provides for extended coverage on the Loans for which no insurance of the type described in clause (i) exists and which names Seller as loss payee and provides for coverage in an amount equal to the aggregate unpaid principal balance of all such Loans, without co-insurance.

**6.2.15. Flood Insurance**.  For each Loan with respect to which the Mortgaged Property is located in an area identified on a Flood Hazard Boundary Map or Flood Insurance Rate Map issued by the Federal Emergency Management Agency as having special flood hazards and flood insurance has been made available, a valid and  existing flood insurance policy meeting the current guidelines of the Federal Insurance Administration with a generally acceptable carrier in an amount  representing coverage of not less than the lesser of (i) the

10

unpaid principal balance, or (ii) the maximum amount of insurance which is available under applicable federal law, rules and regulations, has been endorsed.

**6.2.16. Advances Recoverable**.  All escrow advances and corporate advances identified in the Bid Form were outstanding on the Calculation Date and are eligible for reimbursement out of the proceeds of a foreclosure of the Mortgage in accordance with the terms of the applicable Note and Collateral Documents and "Applicable Law" (as defined in Attachment 5).

**6.2.17. High Cost Products**.  No Loan, at the time it was originated, was subject to the Home Ownership and Equity Protection Act of 1994 or any comparable state or local law.  Without regard to any exemption due to federal preemption which is available to the originator or its assignees, no Mortgage Loan is a "high cost", "threshold", "predatory", "abusive" or "covered" (provided, that "covered" does not apply to loans originated subject to the New Jersey Home Ownership Act of 2002 as a purchase money "covered home loan") loan, as defined by any applicable federal, state or local predatory or abusive lending law and no Loan is subject to any such state law due to its interest rate or points paid. No Loan secured by property located in the State of Georgia was originated on or after October 1, 2002 and prior to March 7, 2003.  No Loan originated on or after March 7, 2003 is a "high cost home loan" as defined under the Georgia Fair Lending Act.

The Seller's representations and warranties set forth in Sections 6.2.4, 6.2.6(a), 6.2.7, 6.2.8, the first sentence of 6.2.9 with respect to prior holders, 6.2.12, and the last sentence of 6.2.13 are made only to the extent of Seller's knowledge.  For purposes of this Section 6.2, all determinations as to the existence of a breach of a representation or warranty qualified by reference to Seller's knowledge shall be made (i) with respect to matters occurring on or before November 21, 2008, on the assumption that Seller has no knowledge thereof unless Seller received written notice of such matter, and (ii) with respect to matters occurring after November 21, 2008, without reference to the qualification as to the Seller's knowledge, it being understood that such qualifications with respect to matters occurring after November 21, 2008 are made in the interest of full and fair disclosure and to preclude claim of fraud and misrepresentation, but are not intended to limit the remedies available under Section 21 for breach of any such representation or warranty.

7.      **Conditions Precedent to Closing**.  The respective obligations of the Buyer and the Seller to complete the purchase and sale of the Loan(s) pursuant to this Agreement are subject to the fulfillment on or prior to Closing Date of each of the following additional conditions to be fulfilled by the other, unless the same is specifically waived in writing by the party for whose benefit the same is to be fulfilled:

**7.1.      Performance of Covenants**.  The Seller and the Buyer shall have performed all of their respective covenants and agreements contained herein which are required to be performed by them on or prior to the Closing Date.

11

**7.2.    Representations and Warranties**.  All representations and warranties of the Buyer set forth in Section 5 and the Seller set forth in Section 6.1 of this Agreement shall be true in all material respects at and as of the Closing Date.

**7.3.    Governmental Approvals**.  All requisite federal, state and local governmental and regulatory approvals relating to the transactions contemplated hereby, if any, shall have been obtained.

**7.4.    Other Approvals**.  Upon the request of the other, the Seller and the Buyer shall provide certified copies of appropriate resolutions, directions and consents approving the execution and delivery of the Sale Documents and the consummation of the transactions contemplated thereby together with such other certificates of incumbency and other evidences of authority as the Seller or the Buyer or their respective counsel may reasonably require.

**7.5.    Collateral Check**.  Seller will cause Custodian to perform a collateral check-in at least 5 Business Days prior to Closing Date.  Prior to Closing, any material exception to the collateral report will allow for a re-price or drop of loan in question. Buyer shall provide to Seller loan level prices prior to Seller executing the contract.  If any loan(s) is/are dropped the Purchase Price will be adjusted based upon the remaining loans and their respective prices.

**8.    Certain Obligations of the Buyer.**

**8.1.    Collection Practices**.  The Buyer will not violate any laws relating to unfair credit collection practices in connection with the Loans.  If there are any Loan(s) designated as HAMP Loan(s) on the Mortgage Loan Schedule, the Buyer, and its Designated Servicer, will not violate the SPA or any applicable Federal or state laws or regulations with respect to the Buyer's, or its Designated Servicer's ownership, collection, and/or servicing of any HAMP Loan(s).  The Buyer hereby agrees to indemnify the Seller and to hold it harmless from and against any and all claims, demands, losses, damages, penalties, fines, forfeitures, judgments, legal fees and any other costs, fees, and expenses incurred by the Seller as a result of (1) a breach by the Buyer of the aforesaid warranties or (2) any claim, demand, or assertion that, after the Servicing Transfer Date, the Seller was in any way involved in or had in any way authorized any unlawful collection or foreclosure practices in connection with the Loan(s) transferred to the Buyer pursuant to this Agreement , including, as applicable, any HAMP Loan(s).  The Buyer agrees to notify the Seller within ten (10) Business Days of notice or knowledge of any such claim or demand.

**8.2.    Reporting to or for the Internal Revenue Service.**  The Buyer agrees to submit all Internal Revenue Service Forms and Information Returns for the Loan(s) for the period during which it owns the Loan(s).

**8.3.    Buyer's Duties Regarding Litigation.**  If the Loan(s) are or become subject to any claim, action, lawsuit, foreclosure action, bankruptcy, or other proceeding, administrative or judicial, or similar action filed by or against any Obligor (collectively,

"Litigation"), Buyer shall, within the later of (i) ten (10) days after the Servicing Transfer Date or (ii) ten (10) days after receipt of notice of such Litigation, provide Seller and Seller's counsel in connection with each such Litigation with the name of counsel selected by Buyer to represent Buyer's interests in such Litigation. Buyer shall, at its own cost, liability, responsibility and risk, within ten (10) days after the Servicing Transfer Date, notify the applicable clerk of all applicable courts and all counsel of record that servicing of the Loan(s) was transferred from Seller to Buyer. Buyer shall have its counsel file appropriate pleadings with all applicable courts within ten (10) days after the Servicing Transfer Date substituting Buyer's counsel for Seller's counsel. Seller shall have the right to notify its counsel representing its interests to cease participating in all Litigation upon the Servicing Transfer Date or any date thereafter.

9.     **Notice to Obligor**. The Buyer shall, within five (5) Business Days after the Closing Date or such other period as may be required by applicable regulations or laws, give notice of this transfer to the Obligor(s) by first class U.S. Mail.

10.     **Notice of Claim.** The Buyer shall immediately notify the Seller of any claim, threatened claim, or any litigation against the Seller, DebtX, or any of their predecessors or affiliates, which may come to its attention relating to the Loan(s).

11.     **Notices**. All notices or deliveries required or permitted hereunder shall be in writing and delivered personally or by facsimile or generally recognized overnight delivery service, and shall be deemed given (a) when delivered, if delivered personally or by facsimile, or (b) on the following Business Day, if sent by generally recognized overnight delivery service, in each case to the Seller at the following address, to the Buyer at the address set forth on the signature page below, or such other address as either party may hereafter designate by notice given in compliance with this Section to the other party:

> SELLER:     U.S. Bank National Association
>             800 Nicollet Mall, BC-MN-H19Q
>             Minneapolis, MN 55402
>             Attn.: Randy G. Denny
>
> With a required copy to:
>
> (a)     in the case of notices under Section 8.3 and Section 23,
>
>         Debra R Wiese
>         Vice President, Mortgage Manager CBSS Servicing
>         U.S. Bank National Association
>         Renaissance Faire Building
>         809 S 60th St Ste 210, MK-WI-RFHM
>         West Allis, WI 53214

13

(b)      in all other cases,

Sachin Jay Darji
Board Certified Specialist in Real Property Law
Vice President and Assistant General Counsel
U.S. Bank National Association
800 Nicollet Mall, BC-MN-H21R
Minneapolis, MN 55402

12.      **Severability**.  Each part of this Agreement is intended to be severable.  If any term, covenant, condition or provision hereof is unlawful, invalid, or unenforceable for any reason whatsoever, and such illegality, invalidity, or unenforceability does not affect the remaining parts of this Agreement, then all such remaining parts hereof shall be valid and enforceable and have full force and effect as if the invalid or unenforceable part had not been included.

13.      **Construction**.  Unless the context otherwise requires, singular nouns and pronouns (including defined terms), when used herein, shall be deemed to include the plural and vice versa, and impersonal pronouns shall be deemed to include the personal pronoun of the appropriate gender.

14.      **Assignment**.  This Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights and benefits hereof, including any attachments hereto, shall be binding upon, and shall inure to the benefit of, the undersigned parties and their respective heirs, executors, administrators, representatives, successors, and assigns.  Notwithstanding anything herein to the contrary, however, the Buyer shall not assign its rights under this Agreement without the prior written consent of the Seller, except that the Buyer may assign its rights under this Agreement to an affiliate, provided that such affiliate adheres to the representations and warranties of Buyer pursuant to this Agreement, and in the event of any assignment both the Buyer and assignee shall be jointly and severally liable hereunder.

15.      **Prior Understandings**.  This Agreement supersedes any and all prior discussions and agreements between the Seller and the Buyer with respect to the purchase of the Loan(s) and other matters contained herein, and this Agreement contains the sole and entire understanding between the parties hereto with respect to the transactions contemplated herein.

16.      **Survival**.  Each and every covenant made by the Buyer or the Seller in this Agreement shall survive the closing and shall not merge into the Closing Documents, but instead shall be independently enforceable; provided, however, that the Seller's representations and warranties set forth in Sections 6.1 and 6.2, except for the representation set forth in Section 6.2.17 and Section 4.8, shall expire one hundred eighty (180) days after the Closing Date, after which time no claim for breach of the Seller's representations or warranties may be made.  For the avoidance of doubt, Section 6.2.17 and Section 4.8 shall survive until the maturity or liquidation of the Loan.

17.      **Choice of Law**.  This Agreement and claims arising out of or in connection therewith shall be governed by and construed and enforced in accordance with the laws of the

14

state of the Seller's incorporation or organization, or, if the Seller is organized under the laws of the United States or a foreign jurisdiction, the state of the Seller's principal place of business, and the Buyer consents to jurisdiction in the federal or state courts situated in the city or county of the Seller's principal place of business.

18.    **Time of the Essence**.  Time is of the essence of all provisions of this Agreement.

19.    **Buyer Failure to Fund.**  If the Buyer fails to pay the Earnest Money to the Seller pursuant to Section 3.1, then the Seller, in its sole discretion, may (i) terminate this Agreement, in which event the Seller and the Buyer shall have no further duties, obligations or liabilities to each other hereunder, except for the Buyer's duties and obligations with respect to Confidential Information under this Agreement which shall continue in full force and effect and/or (ii) pursue all remedies available at law or in equity, including, without limitation, the remedy of specific performance.  If the Buyer fails to tender the balance of the Purchase Price for the Loan(s) on the Closing Date, the Seller may (i) retain the Earnest Money, which is hereby stipulated as the Seller's liquidated damages it being understood and agreed that it is difficult to estimate or otherwise determine the total amount of damages that would be incurred by the Seller should the Buyer default in its obligations under this Agreement or (ii) pursue all remedies available at law or in equity, including, without limitation, the remedy of specific performance.

20.    **Protection of Consumer Information**. The Seller and the Buyer each agree that it (i) shall comply with any applicable laws and regulations regarding the privacy and security of Consumer Information, (ii) shall not use Consumer Information in any manner inconsistent with any applicable laws and regulations regarding the privacy and security of Consumer Information, (iii) shall not disclose Consumer Information to third parties except (A) as permitted by law or regulation, (B) to carry out the express terms hereof or (C) to an affiliate or an actual or prospective financing counterparty of the initial Buyer or any subsequent Buyer to whom a Mortgage Loan or this Agreement is to be assigned, (iv) shall maintain adequate physical, technical and administrative safeguards to protect Consumer Information from unauthorized access and (v) shall promptly notify the other party of any actual or suspected breach of the confidentiality of Consumer Information.  The obligations set forth in this <u>Section 20</u> shall survive the termination of this Agreement until such time as such obligations shall cease to be applicable under any applicable laws and regulations regarding the privacy and security of Consumer Information.

21.    **Confidentiality**.

21.1.    The Seller and the Buyer shall keep confidential and shall not divulge to a third party, without each other's prior written consent, the terms or existence of this Agreement (the "Confidential Information"), the price paid by the Buyer for the Loans or the transactions contemplated hereunder, except to the extent that (i) it is reasonable and necessary for the Buyer or the Seller to do so in working with legal counsel, accountants, auditors, taxing authorities or other governmental agencies, or (ii) such third party is an affiliate or an actual or prospective financing counterparty of the Buyer.  Each party recognizes that, in connection with this Agreement, it may become privy to non-public information regarding the financial condition, operations and prospects of the other party. Except as required by Applicable Law, each party agrees to keep all non-public

15

information regarding the other party strictly confidential, and to use all such information solely in order to effectuate the purpose of this Agreement; provided that each party may provide confidential information to its employees, agents and affiliates who have a need to know such information in order to effectuate the transaction; and provided further that such information is identified as confidential non-public information.  In addition, confidential information may be provided to a regulatory authority with supervisory power over each party.  Notwithstanding other provisions of this Agreement, the Seller and the Buyer (and each employee, representative or other agent of any of the foregoing) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of transactions covered by this agreement and all materials of any kind (including opinions or other tax analyses) that are provided to any of the foregoing parties relating to such tax treatment and tax structure.

**21.2.**   Notwithstanding anything to the contrary in this Agreement, if a party or any of its representatives is legally compelled (whether by governmental agency, regulatory request, deposition, interrogatory, request for documents, subpoena, civil investigation, demand or similar process) to disclose any Confidential Information, such party shall, to the extent permitted by law, promptly notify the other party hereto in writing of such requirement so that such other party may, in its sole and absolute discretion, seek a protective order or other appropriate remedy and/or waive compliance with the provisions hereof.  Each party will use commercially reasonable efforts to obtain or assist the other party in obtaining any such protective order.  Failing the entry of a protective order or the receipt of a waiver hereunder, the party legally compelled to disclose any Confidential Information may disclose, without liability hereunder, that portion of such Confidential Information that it has been advised by its counsel that it is legally compelled to disclose; however, such party agrees to use commercially reasonable efforts to obtain assurance that confidential treatment will be accorded such Confidential Information by the person or persons to whom it is disclosed.

**21.3.**   The obligations set forth in this <u>Section 21</u> shall survive until the termination of this Agreement.

**22.**     **<u>Remedies and Recourse.</u>**  In the event that the Seller shall have any liability hereunder or in connection with the transactions contemplated hereby with respect to the Loan(s), the Buyer's sole claim shall be against the Seller and the Buyer shall not make any claim against DebtX, its parents, subsidiaries, affiliates, agents or employees.  DebtX shall not have any personal liability hereunder or in connection with the transactions contemplated hereby.

**23.**     **<u>Limitation of Damages.</u>**  Neither party shall be liable to the other party for any consequential, special or punitive damages.  If the Seller fails to consummate the sale of the Loan(s) upon the terms and conditions set forth in this Agreement, the Buyer's sole remedy shall be return of the Earnest Money or any other sums previously received by the Seller from the Buyer.  If after the Closing Date the Buyer discovers a breach of any of Seller's  representations or warranties set forth in Section 6 which has not expired, the Buyer shall give written notice to the Seller on or before the earlier of (i) 30 days after discovery of such breach or (ii) the date set forth in Section 16 above on which such representation or warranty expires, and the Seller shall have the right to cure such breach during a period of ninety (90) days after receipt of such notice.

If such breach or failure is not duly cured within such ninety (90) day period, or not waived or consented to in writing by the Buyer, the Seller shall elect, in its sole discretion to either (i) repurchase the Loan(s) at the Repurchase Price, or (ii) to pay to Buyer the Buyer's actual damages directly caused by such breach, up to an amount not exceeding the Repurchase Price. In the case of damages or expenses related to Section 4.8, the Buyer, at its sole discretion will either (i) ask the Seller to repurchase the Loan at the Repurchase Price or (ii) ask the Seller to pay the actual damages related to the breach. Notwithstanding anything in this Agreement to the contrary, (a) Buyer may not assert any claim for any breach of any Seller's representations and warranties, except for the representation set forth in Section 6.2.17 and Section 4.8, after the earlier of (i) the expiration of such representation or warranty set forth in Section 16 above or (ii) one hundred eighty days (180) after the Closing Date, and (b) the Buyer may only assert a claim against the Seller for a breach of the representation set forth in Section 6.2.17 if such breach materially and adversely affects the enforceability of a particular Loan or the interest of the Buyer therein. In addition, Seller will have the obligation to repurchase any Loan that is modified or otherwise subject to any loss mitigation agreement (including, without limitation, any short payoff) entered into on or after the Cut-off Date and on or before the Servicing Transfer Date should the "net present value" of the payments falling due after the Closing date under such Loan, after giving effect to such modification or amendment, be less than the final purchase price for such Loan, as set forth in the Mortgage Loan Schedule. The Buyer's remedies set forth in this Section 21 shall be the exclusive remedies of the Buyer, and the Buyer shall not be entitled to any other rights, remedies or other relief, at law or in equity, for the Seller's breach of any representation or warranty set forth in this Agreement.

     **24.**    **Counterparts; Faxed Document.**  This Agreement may be executed and delivered by the parties in facsimile format and in any number of separate counterparts, all of which, when delivered, shall together constitute one and the same document.

[Signatures on Following Page]
[Remainder of Page Intentionally Left Blank]

17

EXECUTED AS OF THE DATE FIRST WRITTEN ABOVE.

BUYER*:                                          SELLER:


TRUMAN 2016 SC6, LLC                             U.S. BANK NATIONAL ASSOCIATION
(Entity Name)                                    (Entity Name)


By: _____                    By: _____

Name: _____                    Name: _____

Title:  **Mitchell Samberg**                      Title:  Controller, EVP
        ~~Managing Officer~~


Buyer's Address for Notice:

200 Business Park Drive
Armonk, NY  10504
Attention:  DooJin Chung
Telephone Number:  (914) 730-7002
Fax Number:  (914) 730-3028


* THE BUYER ACKNOWLEDGES AND ACCEPTS THAT THE BID PROCESS
SPECIFICALLY REQUIRED THAT THIS AGREEMENT, THE OTHER SALE
DOCUMENTS AND ALL OTHER DOCUMENTS CONTAINED IN THE BID PACKAGE BE
SIGNED WITHOUT MODIFICATION THERETO, AND THAT ANY SUCH
MODIFICATIONS, IF MADE BY THE BUYER, ARE OF NO FORCE AND EFFECT.  THE
BUYER AGREES THAT THE FAILURE OR REFUSAL OF THE SELLER TO ALTER OR
MODIFY IN ANY WAY THE TERMS OR CONDITIONS OF THIS AGREEMENT SHALL
NOT AFFECT THE OBLIGATION OF THE BUYER TO PERFORM HEREUNDER.


[Signature Page to Asset Sale Agreement]

## APPENDIX A

### Definitions

"**Agreement**" is defined in the preamble hereto.

"**Bailee Letter**" means the bailee agreement dated as of October 22, 2018, among Seller, Buyer and Custodian with respect to the Review Files.

"**Bid Award Date**" means the date of the Bid Award Letter.

"**Bid Award Letter**" means the letter from DebtX to the Buyer confirming the award of the Loan(s) to the Buyer in accordance with the terms of the Bid Package.

"**Bid Form**" means the form bid to purchase the Loan(s) submitted by the Buyer and accepted by the Seller in accordance with the terms of the Bid Package, which accepted Bid Form is made a part hereof by reference.

"**Bid Package**" means and includes DebtX's correspondence to the Buyer concerning this transaction, the Bid Form, this Agreement, the Terms of Sale Memorandum and all documents relating hereto.

"**Bid Percentage**" means the percentage amount bid by the Buyer for the Loan(s) as shown on the Bid Form.

"**Business Day**" means any day other than a Saturday, Sunday or national holiday.

"**Buyer**" means Truman 2016, SC6, LLC.

"**Calculation Date**" means September 30, 2018.

"**Closing Date**" means November 19, 2018, or such other date as the Seller and the Buyer may agree in writing.

"**Closing Documents**" is defined in Section 4.1 of this Agreement.

"**Collateral Document**" means the Mortgage(s), any assignments of leases and rents, security agreements, financing statements, guaranties, and other agreements or documents, whether an original or a copy and whether or not similar to those enumerated, evidencing, securing, guarantying or otherwise documenting or giving notice of the Loan(s) and any performance or payment obligations with respect thereto or any document evidencing ownership in any asset that was acquired in connection with a foreclosure, deed-in-lieu of foreclosure or otherwise in connection with the resolution of a Loan, and title insurance policies insuring the ownership or liens thereof, provided, however, that the term "Collateral Document" shall expressly exclude the Note(s).

"**Collections**" means all payments, proceeds and/or awards, actually received by the specified holder of the Note(s), in cash, including checks which have been reduced to good

funds, for (i) current application to the indebtedness of the Obligor under the Loan(s), whether or not so applied and, if so applied, whether applied to principal, interest, fees, or any other such indebtedness, or (ii) incentive or other payments pertaining to HAMP Loan(s).

"**Confidential Information**" is defined in Section 21.1 of this Agreement.

"**Consumer Information**" means any personally identifiable information in any form (written electronic or otherwise) relating to a Mortgagor, including, but not limited to:  a Mortgagor's name, address, telephone number, Mortgage Loan number, Mortgage Loan payment history, delinquency status, insurance carrier or payment information, tax amount or payment information; the fact that the Mortgagor has a relationship with the Seller or the originator of the related Mortgage Loan; and any other non-public personally identifiable information.

"**Custodian**" means the Buyer's custodian, U.S. Bank National Association.

"**Cut-off Date**" means October 31, 2018, or such other date on which Buyer and Seller may agree in writing.

"**DebtX**" means The Debt Exchange, Inc., agent for the Seller.

"**Designated Servicer**" a servicer selected by the Buyer which must show eligibility of participation in HAMP prior to the Closing Date.

"**Earnest Money**" means the payment under this Agreement equal to ten percent (10%) of the Purchase Price.

"**Escrow Agent**" means the Seller's counsel, or such other party as the Seller and the Buyer may agree in writing.

"**Excluded Information**" means information or documentation excluded from the Review File or redacted from documents left in the Review File relating to the Loan(s) or the Obligors including internal memoranda and officer comments, attorney-client correspondence or other information from attorneys or prepared in anticipation of litigation, personal tax returns, and any documents prepared by or for the use of the Seller or DebtX regarding the valuation of the Loan(s).

"**Funding Schedule**" means a schedule prepared by Buyer and provided to Seller not less than two Business Days prior to the Closing Date, setting forth, among other things, the Purchase Price and the Advance Reimbursement for each Loan.

"**HAMP**" is Home Affordable Modification Program.

"**HAMP Loan(s)**" means any Loan(s) designated by Seller as HAMP Loan(s) on the Mortgage Loan Schedule.

"**Litigation**" is defined in Section 8.3 of this Agreement.

"**Loan(s)**" means the loan obligations and debts evidenced by the Note(s) and includes (a) the Note(s); (b) all rights to payment and other rights, title and interests of the Seller in, to and under the Note(s), specifically including, all accrued interest and late charges; (c) each Collateral Document; (d) all rights, title, interests, powers, liens or security interests of the Seller in, to or under each Collateral Document, including without limitation claims and rights to and interests in proceeds of hazard or casualty insurance covering collateral securing such Loan and awards in eminent domain and condemnation proceedings affecting such collateral; (e) all Collections received by the Seller on or after the Closing Date and then or thereafter actually collected in good funds; (f) any right, claim or cause of action, and any liability or counterclaim associated therewith, arising out of or in connection with litigation pending, if any; (g) any judgment or execution based upon the Note(s) or any Collateral Document, to the extent attributable thereto, and any lien arising from any such judgment or execution; and (h) all other documents held by the Seller contained in the Review File with respect to the Loan(s).

"**Mortgage(s)**" means each mortgage, deed of trust or other similar instrument, if any, securing the Note(s), including, without limitation, all modifications, restructurings, extensions consolidations and amendments thereof.

"**Mortgage Loan Schedule**" means the schedule of Loan(s) annexed hereto as Schedule A.

"**Mortgaged Property**" means the real property covered by the Mortgage(s).

"**Mortgagor**" means the maker or co maker of the Note or any guarantor, surety or other primary, secondary or other party obligated with respect to the Loan or any performance or payment obligation in connection therewith, and any other party who has granted collateral for or whose property or any part thereof is subject to any encumbrance securing the Loan or any performance or payment obligation in connection therewith.

"**Note(s)**" means each promissory note, other instrument evidencing indebtedness or other asset as listed on Schedule A, including, without limitation, all modifications, restructurings, extensions, consolidations and amendments thereof.

"**Obligor**" means the maker, co maker of the Note(s) and any guarantor, surety or other primary, secondary or other party obligated with respect to the Loan(s) or any performance or payment obligation in connection therewith, and any other party who has granted collateral for or whose property or any part thereof is subject to any encumbrance securing the Loan(s) or any performance or payment obligation in connection therewith.

"**Purchase Price**" means the amount bid by the Buyer for the Loan(s) as shown on the Funding Schedule on a loan level basis.

"**Repurchase Price**" means with respect to the Loan(s), the price to be paid by the Seller for such Loan(s) if repurchased from the Buyer pursuant to the terms of this Agreement, which shall be computed as follows:

    (a)    the Purchase Price for such Loan(s) on a loan level basis; plus

      (b)     the Advance Reimbursement for such Loan(s) on a loan level basis; minus

      (c)     all amounts paid by any Obligor or otherwise received or collected by the Buyer in respect of the Loan(s) between the Closing Date and the repurchase date (whether characterized as principal, interest, principal and interest, fees, expenses, proceeds and any other payment of every kind and nature), which amounts shall be evidenced and certified by the Buyer to the Seller as true and accurate; plus

      (d)     all (i) reasonable amounts paid by the Buyer in good faith to third parties to collect principal, interest and other amounts due under the Loan(s), and (ii) commercially reasonable advances made by the Buyer to third parties in order to protect the security of its collateral and other advances made by the Buyer pursuant to the Collateral Documents, in each case from the Closing Date to the repurchase date (as evidenced by invoices and canceled checks) and (iii) up to 59 days of accrued and unpaid interest from the Closing Date through the repurchase date on such Loan(s).

"**Review File**" means the instruments and documents delivered pursuant to Section 4.1 and all other instruments and documents in files of the Seller pertaining to the Loan(s), but excluding any Excluded Information

"**Sale Documents**" means the Bid Package (including this Agreement and all attachments hereto), and all other instruments, agreements, certificates and other documents at any time executed and delivered by or on behalf of the Seller and/or the Buyer in connection with the sale of the Loan(s).

"**Separate Loan Assignments**" is defined in Section 4.4 of this Agreement.

"**Seller**" means U.S. Bank National Association.

"**Terms of Sale Memorandum**" means the Terms of Sale Memorandum posted on the DebtX website (www.debtx.com) or otherwise made available to prospective purchasers in connection with the sale of the Loan(s).

"**U.S. Trustee Remediation Loans**" means the Loans identified as such by Seller to Buyer on or before the Closing Date.

END OF APPENDIX A

A-4

**APPENDIX B**

The below loans may not have title polices and title policies will not be provided as part of the Loan File

**SCHEDULE A**

**LOANS**

[Balances to be provided by DebtX prior to Bid Date.]

| Offering Number | Asset Number | Account Name | Principal Balance as of xx/xx/xx |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

[**NTD:    To be updated with full schedule.**]

**ATTACHMENT 1**

**BILL OF SALE**

_____ (the "Seller"), for value received and pursuant to the terms and conditions of that certain Asset Sale Agreement dated _____ between the Seller and _____ (the "Buyer"), does hereby sell, assign, transfer and convey to the Buyer, its heirs, administrators, representatives, successors and assigns, all rights, title and interests of the Seller, as of the date hereof, in, to and under the Loan(s) described in the Asset Sale Agreement.

THIS BILL OF SALE IS EXECUTED WITHOUT RECOURSE AND WITHOUT REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, EXPRESSED, IMPLIED OR IMPOSED BY LAW, EXCEPT AS PROVIDED IN THE ASSET SALE AGREEMENT.

EXECUTED this ___ day of _____, _____.

SELLER:

_____


_____

By:
Its:

**ATTACHMENT 2**

**Allonge**

Reference is made to the $_____ promissory note dated _____ from _____ (the "Note") payable to the order of _____ ("Assignor")[, as successor to _____]. It is intended that this Allonge be attached to and made a permanent part of the Note.

Pay to the order of _____ ("Assignee"), without recourse, representations or warranties of any kind.

Executed this ____ day of _____, _____.

_____

_____
By:
Its:

ATTACHMENT 3

RECORDING REQUESTED BY:
US Bank/Mortgage Servicing
Mary J. Irwin
809 S. 60th Street, Suite 210
West Allis, WI  53214-0000

AND WHEN RECORDED MAIL TO:
US Bank/Mortgage Servicing
809 S. 60th Street, Suite 210
West Allis, WI  53214-0000
ATTN:  Mary J. Irwin


   For good and valuable consideration, the sufficiency of which is hereby acknowledged, U.S. BANK NATIONAL ASSOCIATION, 4801 FREDERICA STREET, OWENSBORO, KY 423010000, by these presents does convey, assign, transfer and set one to _____, _____, the described Mortgage, with all interest, all liens, and any rights due or to become due thereon.  Said Mortgage is recorded in the State of _____, County of _____ Official Records, dated _____ and recorded on _____ as Instrument No. _____ in Book No. _____, at Page No. _____.

Original Mortgagor:

Original Mortgagee:

Property Address:

Dated __/__/2018

U.S. BANK NATIONAL ASSOCIATION

BY: _____, _____



STATE OF WISCONSIN )
       )
COUNTY OF MILWAUKEE)

This instrument was acknowledged before me on 09/11/2018, by _____, _____ of U.S. BANK NATIONAL ASSOCIATION.


       _____
       Notary Public
       My Commission Expires:

**ATTACHMENT 4**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

This Assignment and Assumption Agreement (the "Assignment and Assumption Agreement") is entered into as of [INSERT DATE] by and between [INSERT FULL LEGAL NAME OF ASSIGNOR] ("Assignor") and [INSERT FULL LEGAL NAME OF ASSIGNEE] ("Assignee").  All terms used, but not defined, herein shall have the meanings ascribed to them in the Underlying Agreement (defined below).

WHEREAS, Assignor and [INSERT FULL LEGAL NAME OF COUNTERPARTY], are parties to an Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement, a complete copy of which (including all exhibits, amendments and modifications thereto) is attached hereto and incorporated herein by this reference (the "Underlying Agreement");

WHEREAS, Assignor has agreed to assign to Assignee all of its rights and obligations under the Underlying Agreement with respect to the Eligible Loans that are identified on the schedule attached hereto as Schedule 1 (collectively, the "Assigned Rights and Obligations"); and

WHEREAS, Assignee has agreed to assume the Assigned Rights and Obligations.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Assignment.  Assignor hereby assigns to Assignee all of Assignor's rights and obligations under the Underlying Agreement with respect to the Assigned Rights and Obligations.

2.     Assumption.  Assignee hereby accepts the foregoing assignment and assumes all of the rights and obligations of Assignor under the Underlying Agreement with respect to the Assigned Rights and Obligations.

3.     Effective Date.  The date on which the assignment and assumption of rights and obligations under the Underlying Agreement is effective is [INSERT EFFECTIVE DATE OF ASSIGNMENT/ASSUMPTION].

4.     Successors.  All future transfers and assignments of the Assigned Rights and Obligations transferred and assigned hereby are subject to the transfer and assignment provisions of the Underlying Agreement.  This Assignment and Assumption Agreement shall inure to the benefit of, and be binding upon, the permitted successors and assigns of the parties hereto.

5.     Counterparts.  This Assignment and Assumption Agreement may be executed in counterparts, each of which shall be an original, but all of which together constitute one and the same instrument.

IN WITNESS WHEREOF, Assignor and Assignee, by their duly authorized officials, hereby execute and deliver this Assignment and Assumption Agreement, together with Schedule 1, effective as of the date set forth in Section 3 above.

ASSIGNOR: [INSERT FULL LEGAL NAME OF ASSIGNOR]

ASSIGNEE: [INSERT FULL LEGAL NAME OF ASSIGNEE]

By: _____

By: _____

Name: _____

Name: _____

Title: _____

Title: _____

Date: _____

Date: _____

[Signature Page to Assignment and Assumption Agreement]

**SCHEDULE 1**

**To**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

ATTACHMENT 5


FORM OF INTERIM SERVICING AGREEMENT


THIS INTERIM SERVICING AGREEMENT ("Interim Agreement") is entered into as of the _____ day of November, 2018 by and between U.S. Bank National Association ("Interim Servicer") and Truman 2016 SC6, LLC ("Buyer").

**WITNESSETH:**

WHEREAS, Buyer and Interim Servicer entered into that certain Asset Sale Agreement dated as of November 2, 2018 (the "Sale Agreement");

WHEREAS, pursuant to the Sale Agreement, Interim Servicer has sold, assigned and transferred to Buyer on the Closing Date all right, title and interest of the Interim Servicer in, to and under the Loans described on Schedule A to the Sale Agreement, including, without limitation, the rights to service the Loans; and

WHEREAS, the Sale Agreement provides that, effective as of the Closing Date, the parties thereto shall enter into an Interim Servicing Agreement regarding: (i) Interim Servicer's obligations to perform servicing functions with respect to the Loans for a temporary period from the Closing Date until January 15, 2019 (the "Servicing Transfer Date"), and (ii) the compensation to be paid by Buyer to Interim Servicer for the performance of such functions.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Interim Servicer agree as follows:

**Section 1.     Definitions**.  All capitalized terms used but not defined in this Interim Agreement shall have the meanings set forth in the Sale Agreement.  In addition thereto, the following terms shall have the meanings set forth in this Section 1:

"Ancillary Fees":  With respect to any Loan, (i) any late charges, (ii) any returned item charges (e.g. insufficient funds charges) or payment fees, (iii) any modification or conversion fees, and (iv) any other fees charged by the Interim Servicer that are not specifically addressed in the Asset Sale Agreement or this Interim Agreement.

"Applicable Law": All federal, state and local laws, including statutes, rules, regulations and guidance of governmental bodies or regulatory agencies (including, without limitation, the Consumer Financial Protection Bureau) applicable to the servicing of mortgage loans or any activity related thereto, including, but not limited to, the Truth in Lending Act, the Real Estate Settlement Procedures Act, the Equal Credit Opportunity Act, the Fair Housing Act, the Homeowners Protection Act, the National Flood Insurance Reform Act, the Servicemembers Civil Relief Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Gramm-Leach-Bliley Act, and all applicable state and local laws.

"Applicable Requirements": With respect to any Mortgage Loan, those procedures (including collection procedures) that the Interim Servicer customarily employs and exercises in servicing and administering similar mortgage loans for its own account and which are in accordance with (i) accepted mortgage servicing practices of prudent lending institutions for comparable home equity line of credit mortgage loans in the jurisdiction where the related Mortgaged Property is located, (ii) the terms of the related Note and Collateral Documents, and (iii) Applicable Law.

"Custodial Account": The separate account or accounts created and maintained pursuant to Section 4 hereof.

"Servicing Transfer Instructions": The servicing transfer instructions for the Loans proposed by the Buyer and accepted by the Interim Servicer.

**Section 2.      Term**.  The term of this Interim Agreement shall commence as of the Closing Date and shall terminate upon the close of business on the Business Day immediately preceding the Servicing Transfer Date (except with respect to reconciliations and related matters required by the Sale Agreement and remittances to the applicable Investor on the following remittance date and the related reports).

**Section 3.      Servicing Activities**.  During the term of this Interim Agreement:

(a)      Interim Servicer shall perform all servicing activities with respect to the Mortgage Loans that are required by, and in accordance with the Applicable Requirements.  Interim Servicer shall observe and perform all material covenants, undertakings and obligations required to be observed or performed under the Interim Agreement, the Sale Agreement and the Applicable Requirements.

(b)      Interim Servicer shall use commercially reasonable efforts to collect payments due from Mortgagors under the Mortgage Loans as they become due, including but not limited to (i) principal, (ii) interest, (iii) amounts for hazard and flood insurance premiums, mortgage insurance or guaranty premiums, taxes, legal fees, and costs, as well as repayment of amounts advanced by the Interim Servicer on behalf of the Mortgagor, (iv) late charges, (v) assumption fees and (vi) bad check charges.

(c)      During the term of this Interim Agreement, Interim Servicer shall prepare and deliver to Buyer all reports relating to the Mortgage Loans that are provided for in the Servicing Transfer Instructions.  All such reports shall be delivered in a timely manner.

(d)      Interim Servicer shall not, without the prior written consent of Buyer, destroy any Note or Collateral Documents in its possession that relate to the Mortgage Loans, nor shall it instruct any third party to destroy such records.

(e)      In addition to the other obligations of Interim Servicer set forth herein, Interim Servicer shall process all loan payoffs in the ordinary and normal course of business, and materially in accordance with Applicable Requirements.  Interim Servicer

2

shall cause all payoff checks received by it, or on its behalf, to be date-stamped on the same date that it is received.

(f)     Interim Servicer shall cause all forced order policies to be canceled as of the applicable Servicing Transfer Date, and Buyer shall be responsible for replacing such policies and all costs associated therewith.

(g)     Interim Servicer shall prepare, file and otherwise process all release and reconveyance documents with respect to any and all Mortgage Loans that are paid off in full on or before the Servicing Transfer Date in accordance with the guidelines and requirements of all Applicable Requirements.

(h)     Interim Servicer shall bear all expenses associated with (i) any required advances, including without limitation, taxes, insurance and enforcement costs and fees, and (ii) interest required to be paid to the Mortgagor for escrow accounts, and shall obtain the Buyer's consent before making any servicing advance in an amount greater than $3,000.

(i)     The Interim Servicer shall not extend the final maturity date on any Loan or commence any foreclosure or other proceeding to attempt to collect any Loan. Further, except as otherwise set forth in this Interim Agreement, the Interim Servicer shall obtain Buyer's prior written consent prior to taking any material action (including, without limitation, commencing any litigation, a loan modification or other loss mitigation activity) with respect to a Loan.   The Seller shall indemnify the Buyer for any proceeds the Interim Servicer accepts prior to the Servicing Transfer Date in full satisfaction of a Loan that is less than the Purchase Price for such Loan as provided in Schedule A of the Sale Agreement.

**Section 4.     Custodial Accounts**.

(a)     During the term of this Interim Agreement, Interim Servicer shall maintain and subservice segregated accounts for deposit of funds received as interim services of the Loans, including maintaining accounts previously established for escrow payments as required pursuant to the Applicable Requirements in the depository institution presently utilized by Interim Servicer for such purpose.

(b)     The Custodial Accounts will be held in the name of Interim Servicer in the manner required by Applicable Requirements.  Interim Servicer will not withdraw funds from any such account except as specifically authorized in this Interim Agreement and the Applicable Requirements.

(c)     On each Business Day during the term of this Interim Agreement, Interim Servicer shall deposit in the appropriate Custodial Account all principal and interest, escrow/impound and other collections received by it with respect to the Loans. Interim Servicer shall be responsible for making all advances required by the Applicable Requirements, and shall be responsible for prompt payment of all monthly remittances to the Buyer, all taxes, assessments, premiums for mortgage insurance and guaranty and premiums for hazard insurance and flood insurance policies, and all other related fees and

3

charges during the term of this Interim Agreement. If adequate funds are not held in the Custodial Accounts to pay such amounts (other than remittances to the Buyer) when due, Interim Servicer shall advance sufficient funds to cover any such deficiency in a manner to ensure payment of such amounts prior to the time at which any such items become delinquent.

(a)      As of the Servicing Transfer Date, for the Loans, Seller will prepare a reconciliation to insure the transfer to the Buyer of the sum of 1) positive escrow balances, 2) suspense balances, 3) restricted escrow balances and 4) replacement reserve balances.  In the reconciliation, Seller will deduct funds owed by Buyer to Seller for 1) negative escrow balances between the Cut-off Date and the Servicing Transfer Date and 2) corporate advances between the Cut-off Date and the Servicing Transfer Date.  If funds are owed to Buyer, Seller will wire funds to Truman at:

| | |
|---|---|
| Account Name: | Truman 2016 SC6 Title Trust |
| Bank Name | US Bank NA |
| ABA: | 091000022 |
| Account Number: | 173103322058 |
| FFC: | SC6 TT 184254000 |
| Reference: | Interim Collections – USBank MSP414 |

If funds are owed to Seller, Buyer will wire funds to: U.S. Bank, Bloomington, MN for credit to a/c #112588726, ABA 091000022, Attn: Deb Wiese-Escrow /Corporate Advance reconciliation.

**Section 5.**     **Fees**.  The interim servicing fee during the term of this Interim Agreement shall be equal to eighteen dollars and seventy-five cents ($18.75) per Mortgage Loan for each full or partial calendar month that Interim Servicer interim services the Mortgage Loans during the term hereof (the "Interim Servicing Fee").  Interim Servicer will retain all Ancillary Fees and float benefits related to the Custodial Accounts during the term of this Interim Agreement.

**Section 6.**     **Insurance**.  At all times while this Interim Agreement is in force, Buyer and Interim Servicer each shall maintain at their own expense policies of fidelity, theft, forgery and errors and omissions insurance in such amounts as are required to maintain Buyer and Interim Servicer, respectively, in good standing under all applicable laws and under the requirements of the Applicable Requirements.

**Section 7.**     **Representations of Interim Servicer**.  Interim Servicer hereby represents and warrants to and covenants with Buyer (such representations and warranties to be true and correct throughout the term of this Interim Agreement) as follows:

(a)      Interim Servicer is duly organized, validly existing and in good standing under the laws of the United States of America.  Interim Servicer has obtained and will maintain all necessary permits, qualifications, registrations, licenses, and other governmental approvals, as are necessary in order to conduct its activities hereunder.

4

(b) Interim Servicer has the power, authority and legal right to enter into and perform this Interim Agreement and to perform each of the obligations required of it hereunder, and this Interim Agreement and any document or instrument delivered to Buyer by Interim Servicer pursuant hereto has been duly authorized, executed and delivered.

(c) This Interim Agreement and any documents or instruments now or hereafter executed and delivered to Buyer by Interim Servicer pursuant to this Interim Agreement constitute (or shall, when delivered to Buyer by Interim Servicer, constitute) valid and legally binding obligations of Interim Servicer enforceable against Interim Servicer in accordance with their respective terms, except as may be limited by or subject to (i) any bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(d) Interim Servicer has in full force and effect all insurance required under Section 6.

(e) During the term of this Interim Agreement, Interim Servicer will service the Mortgage Loans in accordance with all Applicable Requirements.

**Section 8.** **Representations of Buyer**. Buyer hereby represents and warrants to and covenants with Interim Servicer (such representations and warranties to be true and correct throughout the term of the Interim Agreement) as follows:

(a) Buyer is a duly organized, validly existing and in good standing under the laws of the State of Delaware.  Buyer has obtained and will maintain all necessary permits, qualifications, registrations, licenses, and other governmental approvals, as are necessary in order to conduct its activities hereunder.

(b) Buyer has the power, authority and legal right to enter into and perform this Interim Agreement, and this Interim Agreement and any document or instrument to be delivered by Buyer to Interim Servicer pursuant hereto has been duly authorized, executed and delivered.

(c) This Interim Agreement and any document or instruments now or hereafter executed or **delivered** by Buyer to Interim Servicer pursuant to this Agreement constitute (or shall, when delivered by Buyer to Interim Servicer, constitute), valid and legally binding obligations of Buyer enforceable against Buyer in accordance with their respective terms except as may be limited by or subject to (i) any bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, and (ii) general principals or equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(d) Buyer has in full force and effect all insurance required under Section 6.

**Section 9.** **Indemnification**. In addition to and not in limitation of the respective obligations of the parties set forth in the Interim Agreement, each party shall indemnify and hold

harmless the other party against, and reimburse such other party for, any losses resulting from or arising out of a material breach of any representation or warranty or covenant, agreement or other requirement of the indemnifying party contained in this Interim Agreement.  Furthermore, Interim Servicer shall indemnify and hold harmless Buyer for any gross negligence or willful misconduct related to its servicing of the Mortgage Loans, and any failure to comply with Applicable Requirements.

**Section 10.    Notice of Problems**.  Interim Servicer shall promptly furnish to Buyer (a) any notice it receives from any governmental authority, Insurer, Investor, Agency or mortgagor of a possible or asserted claim or lawsuit against Interim Servicer or Buyer for repurchase of a Mortgage Loan, indemnification for damages, or other possible remedy or sanction based upon an alleged breach or violation by Interim Servicer, or any prior servicer, of any Applicable Requirement with respect to the Servicing Rights it subservices hereunder, or (b) notice of any prior servicing or origination deficiency of which it receives notice or discovers following its assumption of servicing responsibilities hereunder, and in either case, shall consult with Buyer.

**Section 11.    Notifications**.  Each party shall immediately upon receipt, notify the other party of any notice, instruction, demand, or any communication from any Investor which affects the Mortgage Loans, the Servicing Rights, the Custodial Accounts or the Mortgage File documents.

**Section 12.    Effect of Termination**.  Each party's indemnification obligations pursuant to Section 9 of this Interim Agreement shall continue after the term or any termination of this Interim Agreement subject to the limitations contained in Section 9 of this Interim Servicing Agreement.

**Section 13.    Miscellaneous**.

(a)    Notices.  All notices, requests, demands and other communications that are required or **permitted** to be given under this Agreement shall be in writing and shall be deemed to have been duly given upon the delivery or mailing thereof in the manner, and at the addresses set forth in, Section 11 of the Sale Agreement, or to such other address as Buyer or Interim Servicer shall have specified in writing to the other.

(b)    Severability of Provisions.  If any one or more of the covenants, agreements, provisions, or terms of this Interim Agreement shall be held invalid for any reasons whatsoever, then such covenants, agreements, provisions, or terms shall be deemed severable from the remaining covenants, agreements, provisions, or terms of this Interim Agreement and shall in no way affect the validity or enforceability of other covenants, agreements, provisions, or terms to this Interim Agreement.  If the invalidity of any part, provision, representation, or warranty of this Interim Agreement shall deprive any party of the economic benefit intended to be conferred by this Interim Agreement, the parties shall negotiate in good faith to develop a structure the economic effect of which is nearly as possible the same as the economic effect of this Interim Agreement without regard to such invalidity.

(c)    No Partnership.  Nothing herein contained shall be deemed or construed to create a partnership or joint venture between the parties hereto and the services of Interim Servicer shall be rendered as an independent contractor and not as agent for Buyer.

(d)    Execution.  This Interim Agreement may be executed in one or more counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same agreement.

(e)    Assignment.  This Interim Agreement is not assignable.

(f)    Effect of Headings.  The headings in this Interim Agreement are for purpose of reference only and shall not limit or otherwise affect the meaning hereof.

(g)    Other Agreements.  This Interim Agreement supersedes all prior agreements and understandings relating to the subject matter hereof, except for the Sale Agreement.  In the event of any conflict, contradiction or inconsistency between the Interim Agreement and Sale Agreement, the terms of the Sale Agreement shall control over the Interim Agreement.

(h)    Amendments; Waiver.  Neither this Interim Agreement nor any term hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.  A failure or delay on the part of either party to exercise any right, power or privilege hereunder shall not operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise or the exercise of any other right, power or privilege, nor shall any waiver as to a particular matter constitute a waiver as to any future similar matter.

(i)    Agreement.  The parties agree to execute and deliver such instruments and take such actions as either party may, from time to time, reasonably request in order to effectuate the purposes and carry out the terms of this Interim Agreement.

(j)    Existence of the Parties.  During the term of this Interim Agreement, the parties will keep in full force and effect and in good standing their existence, rights and franchises, and approval status with all Investors and Agencies.

(k)    Governing Law.  This Interim Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota, without giving effect to its choice of law principles.

(l)    Access to Information.  Interim Servicer shall, except with respect to those items as to which one Party has brought an action against the other Party, allow Buyer and its counsel, accountants, and other representatives, reasonable access, during normal business hours throughout the Interim Period and upon reasonable notice, to all of Interim Servicer's files, books and records directly relating to the Servicing Rights, the Mortgage Loans, Custodial Accounts and Advances. Buyer and its representatives and affiliates shall treat all information obtained in such investigation, not otherwise in the public

7

domain, as confidential and shall not use any such information for its own benefit, unless Buyer acquires the related Servicing Rights hereunder.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

IN WITNESS WHEREOF, each of the undersigned parties to this Interim Agreement has caused this Interim Agreement to be duly executed in its name by one of its duly authorized officers, all as of the date first written above.

**U.S. BANK NATIONAL ASSOCIATION**


By: _____
Name:_____
Title:_____


**TRUMAN 2016 SC6, LLC**


By: _____
Name:_____
Title:_____


[Signature Page to Interim Servicing Agreement]